IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

P. Mack Shatee - pro se

#331844 NBCI
14100 McMullen Hwy sw plaintiff
Cumberland MD 21502

Civil No.

JAN 3 0 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

v:

Robert Hartman et. al.
Acting Superintendent - C+O Canal NPS
Lisa Mendelson-Ielmini
Dep. Reg. Director - NPS Capital Region
John Doe 'x'
Acting Dep. Reg. Director NPS
1100 Ohio Drive Washington D.C. sw 20242
National Park Service - Capital Region
U.S. Government - Washington D.C.

Case: 1:08-cv-00183
Assigned To : Unassigned
Assign. Date : 1/30/2008
Description: Pro Se General Civil

II. Basis of Jurisdiction
28 USC 1331, 1343, 1367

III. National Park Service Headquarters
1100 Ohio Dr. sw Washington D.C. 20242
(C+O NPS: 1830 Dual Hwy Hagerstown, MD 21740)

IV. Nature of the Lawsuit
Conspiracy to Deprive Civil Rights

V. This is an original proceeding and Defendants
are being sued in their individual and official capacity

VI. Cause of Action
42 USCA 1985 (2) + (3)
42 USCA 1986

RECEIVED
JAN 2 2 2008
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

# Contents:

Complaint                                                    Page(s)
Motion For Court Appointment of Counsel (EAJA)              1 - 13
                                                              14


                        Appendix:
LEASE (important parts)                                        A
Description of Work Completed                                  B
Actual Financial Losses                                       C
Letter from Kevin Brandt 3/4/04                               D
Counter Letter from Mark Ryscavage 5/18/04                   E
Washington Post Article RE: Kevin Brandt                     F
Letter from Robert Hartman 12/1/05                           G
Financial Statement - Criminal Case                          H
Brief Description - Criminal Case                             I
STATEMENT OF PROCEEDINGS                                      J
Letters from NPS                                             K
Letter to MD District Court - see Judges notation           O
Letter to MD District Court - see Judges notation           P
Letter from MD District Court                                Q
Order from MD District Court                                  R

① 

## Complaint:

On May 1, 2000, Plaintiff Shafer entered into a 20 year contract with the C+O Canal National Park Service Superintendent (App: A-1 to 7) Doug Faris and Terry Carlstrom, the National Capital Regional Director of the National Park Service. Since the execution of the Contract, Doug Faris has passed away from Colon Cancer and Carlstrom has been replaced with a new director. Kevin Brandt has become the new Superintendent of the C+O Canal NPS since Faris' passing. However, the person that was designated as "Acting" Superintendent for the time and actions specifically relating to this complaint is the Defendant, Robert H. Hartman Jr. Terry Carlstrom is named Defendant #2, while John Doe, Regional Director of the National Capital Region is Defendant #3 and currently name unknown as the NPS apparently uses a revolving door philosophy to avoid accountability assigned to any one person as result of past wrongs against citizens by the agency.

The nature and objective of the Contract was a 'lease for restoration' program. Shafer

(2) was to complete specifically designated historic preservation work, some $88,000 on the circa 1780, "Burnside Property," a.k.a. "Dellinger House," and "Joseph Spriggs Property". (see www. Herald-Mail.com/archives for the "Joseph Spriggs Property by Pat Schooley · May 2004) The objective was to take some 41 properties identified for the program and through a joint partnership, restore these historical properties back to their original grandeur after years of neglect and deterioration under NPS ownership. Most of the properties were taken against the will of Washington County (& others) families whom in many cases, had owned the properties for generations. After the complete failure of the program under the direction of Kevin Brandt, some of the properties have been claimed and are now occupied by park service agents, while others have simply deteriorated beyond repair.

   Almost immediately after commencing work on the Burnside Property, it was learned that the level of deterioration far exceeded the general scope of the contract and became a source of temporary impass. While the contract

(3) seemed to be set in stone as far as the scope of work, every aspect of restoration led to deeper problems. Foundations had shifted and gave way, Structural issues became exposed that caused concern of imminent collapse on some structures while simple paint work uncovered deep internal wrought of wood framework that needed to be rebuilt from scratch before paint work was even possible. All in all, what was initially deemed as a cosmetic enhancement evolved into an extensive restoration project.

The first two years were spent on smaller issues, while no further major investment was appropriate until there came an amended contract. This new amended contract signed in September 2003, made clear that there was far more work to be done, a higher price to be paid and acknowledged that there needed to be a degree of flexibility, that ultimately the property itself, along with the Secretary's Standards for Historic Restoration dictated the extent of work to be performed. It was agreed that it would take a serious good faith effort on behalf of all parties for the program to succeed.

(4)    At the meeting in September 2003, in which the contract was amended, there was a minimum of $165,000.00 worth of restoration work that needed done minimally, and immediately, to comply with both the contract and historical restoration standards. It was also made clear that the sustained preservation of the Burnside Property would cost in the neighborhood of $250,000.00 (APP: B) + (APP: C)

From the Contracts inception back in 2000, through the end of 2003, Shaker invested some $196,650.00 in resources, made great personal sacrifices and dedicated nearly two years of life, exclusively to see the project through. During the winter of 2003-2004, with the project in high gear, issues of lead paint and asbestos presence became evident. As a result, a 'Cease + Desist' work order was issued and an extensive test was conducted by an independent contractor. The lead paint was tested at 120 (X) times the legal exposure limit for dust residuals and sources were identified. As for the asbestos, the problem was limited to some old floor tile and adhesive.

Sadly, at the period that work had

(5) Ceased because of the lead paint, Doug Feris had become seriously ill with cancer. This caused a void in which Deputy Superintendent, Kevin Brandt was in no way prepared or qualified to fill. Shake took it upon himself to get trained and certified as a LEAD PAINT ABATEMENT Supervisor through Hagerstown Community College so that work could resume. However, through the turmoil of transition, Kevin Brandt refused to ever once, visit the property upon inheriting The "Acting Superintendent's" position, nor call to discuss Removing the cease & desist work order.

Shake met with the Lease with Restoration programs coordinator's, Tina Orca & James Peavy on numerous occasions.... yet, Kevin Brandt never Responded. Alternatively, in April 2004, Brandt sent a notice stating that Shake was in default on the terms of the Contract, Brandt cited failure to pay Rent in which my rent was paid through the year **2018**. When you add the 196,650 with 10,560 (1st yr free) it totals $204,210.00 The yearly lease amount was $10,560; or $880 per month, which represents **233** months paid 18½ years Through **2018**. (App: D-1+23)

In the April 2004 notice, Brandt also cited that work was not completed, while Shake

⑥ had more than doubled the original $88,000 of contracted work as $196,650 had been completed. To this day, Kevin Brandt fraudulently conceals that the work stoppage was caused by Brandts 'Cease + Desist' work order due to the presence of lead paint.

At that time, my then attorney, Mark Ryscavage sent a letter to BRANDT clarifying that Shafer had not breached the terms of the contract and any further attempts to harrass Shafer or terminate the contract would result in litigation for Civil Rights Violations. Kevin Brandt never again Contacted Shafer.   (App's E·1+2)

Throughout the period between the 'Cease + Desist' work order, Faris' departure and Brandts transition to 'Acting' superintendent, Brandt chose to harass Shafer in an aggravating abuse of power, rather than chance exposing his misconduct in a Court of law.

In the winter of 2003-2004, Brandt threatened to evict Shafer for clearing small trees and **S**hrubs as previously directed to do so by the preceding administration to restore a pasture area overgrown by Park Service neglect. Brandt brought in droves of agents that

(7) harrassed Shafee in direct violation of the contract. Brandt escalated his misconduct when he sent Shafee a Bill for over $44,000 to replace the cost of trees and shrubs that had been cleared as directed.

It's interesting to note BRANDT'S double (App. F) standard as painted in a Washington Post Article by Miranda S. Spivack, in November 2007. During this exact period that BRANDT was harrassing Shafee about clearing "small trees + shrubs" as previously directed, where according to the Inspector General's report in 2006, "The Park Service had improperly helped Snyder (Redskins owner) cut down more than 130 trees behind his estate," which abuts the canal, but was subject to a historical easement. The report said, "high-ranking Park Service officials pressured lower-level employees into allowing Snyder to cut down trees in 2004 and to by-pass environmental laws." The report also said, "The responsibility should have been left to NPS biologists + horticulturists, who had advised against the tree cutting on Federally protected property and should have been opened for public debate." BUT, "did not accuse Snyder of doing anything improper when he got permission to clear 50,000 square feet of mature trees." How's that work?

(8)    Brandt additionally harrassed Shakee with apparent animus when he attempted to **evict** her for maintaining farm animals on the farm as previously approved. Brandt escalated his stalking to the point that he placed liens against Shakee's taxes with no notice or due process. When Shakee contested this action, BRANDT simply avoided returning Shakee's calls and refused to meet with Shakee on repeated occaisions when Shakee appeared at NPS headquarters in person. (NPS owes Shakee # 194,780)

Some 18 months later when Shakee was not home, on or around November 10, 2005, Brandt took it upon himself to take all of Shakee's property, from the farm to 5 vehicles, a 1997 Ford Explorer, 1996 Chrysler Concorde, 1989 Ford Econoline Work Van, 1989 Lincoln Continental and a 1994 Ford Windstar as well as all furniture and clothes, personal effects + heirlooms, a player piano, brand new stainless steel appliances, and all of my business records.    (App: G)

At the time of the illegal seizure of my property, in which Brandt contends was "abandoned" when I "vacated the property" (18 months after the contract was terminated) Shakee had gone to court on a charge related

(9) to the handling of Shake's grandmother's money in which Shake had power of attorney. Shake had used his grandmother's money exclusively for her benefit and per her direction which included the renovation of her home for $9385 which (App. H) according to pre-work + post-work professional appraisals had increased the value of her home from $105,000 up to $139,000. When you take the $34,000 gross gain, less the $9385 cost of work, created a benefit of $24,615⁰⁰ net gain for my grandmother. The amount of money in Shake's control under the power of Attorney was only $20,923³⁰. Hence, Shake met his obligation to "maintain assets" without even considering the $16,998 in payouts on my grandmother's behalf, which included some $5460 of Shake's own money. However, Brandt illegally seized all of Shake's Records and forced Shake to defend himself at trial for an alleged financial crime, with absolutely no defense documents. Shake was ultimately convicted of a 'Theft-Scheme' crime that never existed, in which Shake could have easily proven his innocence, but for Brandt's illegal seizure and withholding of BRADY material, (App. I-1)

Also crucial to Shake's defense, was evidence in those Records that show that the entire case stemmed from the Vindictive Retaliation against

(10) Shakee by the Adult Protective Services agent in charge of my grandmother, Paula Price. Shakee had reported Paula's neglect of my grandmother to a physician at Washington County Hospital's ER where Shakee had taken his grandmother for emergency help. At trial, Paula Price perjured herself and got away with it regarding the Emergency Room visit and subsequent emergency order that was issued to Paula Price in which she denied ever receiving. Brandt illegally seized my impeachment materials and allowed Shakee to be prosecuted and sentenced to 15 yrs in prison for a crime that never existed.

(APP: J) Shakee contacted Brandt many times to seek administrative remedy but never once received a response from Brandt. Shakee contacted the U.S. District Court in Baltimore and the Maryland District Court who in turn had notified BRANDT of the Replevin action against him which was dismissed without prejudice for exceeding monetary value jurisdiction. The District Court also notified Shakee that no legal proceeding for eviction or termination of contract had been initiated by BRANDT and that in order for eviction to occur, due process dictates notice and hearing be afforded. (APP: O-R)

Shakee has since learned that at least

(11) in part, the reasoning for BRANDT'S failure to respond was that, in fact, the CoO NPS had no administrative remedy and appeal process in place. In the previously quoted Washington Post article, Brandt said;

"The National Park Service has created a new appeals process... the Review process, which set up an internal appellate system, could open up the possibility of similar appeals." When Snyder asked how he could appeal his (rejected request) to rebuild a wall in danger of imminent collapse, Brandt said, "There was no formal process (system), but the agency decided to set up a process to allow appeals of decisions... because the park has not actively used this kind of system, we did not know what kind of process to use to establish an appeal..." (App: F)

As a result of Kevin Brandt's failure to respond or to return my property and records, which are now essential to my collateral review hearing, I forwarded a "NOTICE OF INTENT TO SUE" to Secretary of the Department of the Interior, Dirk Kempthorne, on or around June 20, 2006. Though Dirk Kempthorne did not respond to, he forwarded the notice to the National Park Service, Director, as a Freedom of Information request "FOR RECORDS THAT WERE (App: K)

(17) ILLEGALLY SEIZED, DESTROYED OR DISPLACED FROM THE BURNSIDE PROPERTY," on July 31, 2006, in which Then acting director (JOHN DOE 'X') responded to Shaker on August 10, 2005. In that response, the acting Director 'JOHN DOE 'X' sent Shaker a BILL for $148,189.00 to cover the cost of locating and photocopying my records That were illegally seized in the first place. JOHN DOE X gave Shaker 20 days to pay the $148,189 in full or in the alternative, the Request for the seized documents would be dismissed, in which they seem to Think it has been. However, Shaker sent a very specific response requesting my illegally seized records only, dated August 16, 2006, and subsequently acknowledged receipt by Deputy Regional Director Lisa Mendleson on September 6, 2006. She dismissed that very specific request by stating; "we find your letter devoid of any explanation to direct the NPS on precisely how you would reduce The scope of your FOIA Request." All I wanted were my documents, nothing more and nothing less. As of January 8, 2008, after constant contact with BRANDT's lawyer, They still refuse to give me my Records for a collateral review hearing on January 31, 2008, and they refuse to Return my property, effects and vehicles.

(13)   Since my pursuit of the information, I have now learned that for the date of the property seizure, Kevin Brandt designated Robert Hoefnan as acting director for the purpose of illegally seizing my records and property. Apparently, this is an attempt to manipulate accountability, liability and responsibility for the illegal conducts.

As of 1/8/08, the Defendants fraudulently contend that Shaker "failed to pay rent" and "failed to complete work" and "contract was terminated in April 2004, (while 18 months later), in November 2005, Shaker finally vacated property in response to eviction 18 months earlier, and having given Shaker notice to remove his personal belongings on December 1, 2005, and Shaker's failure to do so, the NPS disposed of personal property". However, the undisputable & verifiable truth is that Shaker had completed more than double the original $88,000 in designated work, rent was paid through work completed until the year 2018, the work stoppage was caused by an NPS Cease & Desist work order, and even after Shaker became certified in lead paint abatement, NPS refused to lift order, and although NPS may have sent a letter on December 1, 2005, my business records, personal property, the farm and 5 vehicles were seized prior to my Nov. 10 + 15 trial date as confirmed by impound records. There was no grounds for the illegal termination of the contract, nor the illegal seizure of property and moreover, everything was subject to judicial review in accordance w/ due process "equal protection"

(14)   *Relief Sought:*

I. Monetary Damages

   Compensatory                    $194,780⁰⁰

   Punitive × 3        TOTAL       $584,340⁰⁰

II. Declatory Relief by Separate Motion

III Injunctive Relief

   A) Mechanics Lien on Property
       pending outcome of lawsuit
   B) Return of Vehicles and Personal
       property or immediate payment $45,650
   C) Return of all records, documents
       invoices, contracts and photographs
       and other BRADY MATERIALS
   D) Appointment of Counsel


   Respectfully Submitted

   [signature]   # 331844
                 NBCT

   14108 McMullen Hwy SW
   Cumberland, MD 21502

*Appendix: A-1*

NATIONAL PARK SERVICE

# LEASE

# HISTORIC BURNSIDE PROPERTY

CHESAPEAKE AND OHIO CANAL NATIONAL HISTORICAL PARK

WASHINGTON COUNTY, MARYLAND

BY

**MARK SHAFER**
**MARK KURZAWA**

MAY 1, 2000

08 0183

# FILED

JAN 3 0 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

*A-2*

## NATIONAL PARK SERVICE

## LEASE

## OF HISTORIC PROPERTY IN

## CHESAPEAKE AND OHIO CANAL NATIONAL HISTORICAL PARK

## WASHINGTON COUNTY, MARYLAND

### No. 3100-00-0001

THIS LEASE is made and entered into as of **May 1, 2000**, by, through, and between the United States of America, hereinafter called the "United States," acting through the United States Department of the Interior, National Park Service, hereinafter referred to as the "Lessor" and **Mark Kurzawa and Mark Shafer, Tenants,** hereinafter referred to as the "Lessee."

**WITNESSETH:**

The Lessor, for and in consideration of all of the rents, terms, agreements, covenants, conditions and provisions hereinafter set forth in this Lease to be paid, kept and performed by the Lessee, hereby leases to the Lessee for the term of **Twenty (20) Years** the following described property, together with the buildings and improvements now located thereon, as well as all improvements hereafter constructed in accordance with the provisions hereof. The following land, buildings, and improvements are hereinafter collectively referred to as "the Premises":

> **Burnside House and Surrounding Grounds**, as described in Exhibit A, attached hereto and made a part hereof. The address of the Burnside Property is 15121 Spring Dell Road, Williamsport, Maryland.

THIS LEASE is granted subject to the following terms:

### 1. USE

The Lessee agrees to use the Premises and the improvements thereon solely for the purposes of a **private residence,** as more fully described in the Lease Proposal, Exhibit B, attached hereto and made a part thereof, and for no other purpose without the written consent of the Lessor. Lessee may amend or change such use subject to the prior written approval of Lessor. No changes of use of the Premises shall be approved unless Lessor



## 4. RENT

Lessee shall pay to the United States the fair market rental value for Lessee's use and occupancy of the Premises. The fair market rental value as established by a qualified professional appraiser in accord with National Park Service regulations has been taken into consideration. The fair market lease rental value for both the Burnside Property and the associated land is **Eight Hundred Eighty Dollars ($880.00) per Month.**

Rental payments are due to the United States monthly in advance, on or before the first day of the month. All compensation shall be made payable to the NPS, and forwarded by the Lessee directly to the Superintendent, Chesapeake and Ohio Canal National Historical Park.

No rent is due until the Initial Capital Improvements are complete, or until **Twelve (12) Months** from the commencement date of this Lease, whichever occurs first. Costs incurred by the Lessee for Initial Capital Improvements (excluding any interest costs incurred) to the Premises during the first **Twelve (12) Months** from the commencement date of this Lease will be applied toward the rent until such Initial Capital Improvements costs are fully credited. The crediting of the Initial Capital Improvements shall occur as follows:



1. For each month that rent is due, the Lessee shall pay the Lessor **Fifty Percent (50%)** of the rent, which is **Four Hundred Forty Dollars ($440.00) per Month**.

2. The **Fifty Percent (50%)** balance of the rent due, which is also **Four Hundred Forty Dollars ($440.00) per Month**, shall be credited toward the Lessee's rent payment from the total costs incurred by the Lessee for Initial Capital Improvements during the first **Twelve (12) Months** from the commencement date of this Lease.

This arrangement shall continue until the total amount of such Capital Improvement costs has been fully credited to the Lessee. At such point, the Lessee shall remit **One Hundred Percent (100%)** of the monthly rent, which is **Eight Hundred Eighty Dollars ($880.00) per Month**, to the Lessor whenever rent is due.

If the Lessor determines, as set forth in Paragraph 10 of this Lease, to reimburse the Lessee for expenses undertaken subsequent to the first **Twelve (12) Months** from the commencement of this Lease, such reimbursement shall take place through a credit against the Lessee's rental payment. Once the Lessor has determined to reimburse such costs, **One Hundred Percent (100%)** of the reimbursement expense approved by the Lessor shall be deducted from the sum of the next monthly rent due to the Lessor. In the event the rent due to the Lessor is less than the amount of reimbursement to be provided to the Lessee

-5-



the balance of the reimbursement due to the Lessee shall be credited to the next successive month's rental payment. This arrangement shall continue until the total amount of the reimbursement expense approved by the Lessor has been credited to the Lessee.

Initial Capital Improvements are defined as the rehabilitation, restoration and/or reconstruction, as defined in 36 CFR 18.2 (1999), performed by Lessee for initial occupancy of the Premises and compliance with appropriate codes and accessibility standards, made in accordance with the "Lease Proposal", attached hereto and identified as Exhibit B. Initial Capital Improvement costs exclude costs of Preservation Maintenance and the costs of subsequent Alterations. Lessee shall keep records of Initial Capital Improvement costs in accordance with accepted accounting practices and provide the records to the Superintendent, C&O Canal National Historical Park, each quarter as evidence of Lessor's amortization schedule. In the event the lease is terminated, Lessee shall not claim compensation for any expenditures amortized pursuant to this section.

## 5. INVENTORY AND CONDITION REPORT

As of the commencement date of this Lease, an inventory and condition report of all personal property and improvements of the Lessor included in this Lease shall be made by a representative of the Lessor and a representative of the Lessee to reflect the then present condition of said property. A copy of said inventory and condition report shall be attached hereto as Exhibit C and shall become a part hereof as fully as if originally incorporated herein. At the expiration, revocation, or termination of this Lease, a similar inventory and condition report shall be prepared and submitted to the Lessor, said inventory and condition report to constitute the basis for settlement by the Lessee with the Lessor for leased property shown to be lost, damaged, or destroyed, any such property to be either replaced or returned to the condition required by Condition No. 12 hereof, or at the election of the Lessor reimbursement made therefore by the Lessee at the then current market value thereof.

## 6. ACCEPTANCE OF THE PREMISES

Lessee has inspected and examined knows the condition of the Premises and all improvements thereon, and expressly agrees to take the Premises and all improvements thereon in their existing "as is" condition, and without obligation on the part of the Lessor to make any alterations, repairs, or additions thereto. Lessee acknowledges that in entering into this Lease, Lessee does not rely on, and Lessor does not make, any express or implied representations or warranties as to any matters including, without limitation, its location within the flood plain, the suitability of the soil or subsoil; any characteristics of the Premises or improvements thereon; the suitability of the Premises for the intended use; the economic or programmatic feasibility of Lessee's use and occupancy of the Premises; hazardous materials on or in the vicinity of the Premises; or any other matter.

*APP: A-5*

Lessee is on notice of, and acknowledges that National Park Service regulations concerning historic leasing, currently set forth at 36 CFR part 18 (1999), shall govern this Lease and Lessor actions.


## 7. SITE AND GROUND DISTURBANCE; ARCHEOLOGICAL INVESTIGATIONS AND REMAINS.

Lessee shall obtain Lessor's approval in writing prior to any site improvements, ground disturbing activity, or landscaping treatments; including but not limited to activities such as: the cutting, pruning or removal of any vegetation or trees; the use of pesticides or insecticides, planting plans, paving, utility trenching; and activities changing the contour or condition of the property on either a temporary or permanent basis. Lessee shall provide plans and specifications and any other information necessary to Lessor, including runoff plans and calculations, as requested by Lessor

Lessee shall pay for all costs associated with archeological investigations which Lessee shall initiate, pursue or otherwise authorize and assure that no archeological remains or objects of historical or scientific value shall be disturbed, and that all such objects found on the land shall be immediately turned over to the Lessor. Lessee shall not be required to pay for costs associated with any archeological investigations required by governmental or judicial process unless required pursuant to Lessee activities and use of the Premises.

*At the time of 'Cease + Desist' order Kevin Brandt took over + never once managed or contacted us, he simply abandoned the program.*

## 8. IMPROVEMENTS AND ALTERATIONS

Lessee shall not undertake any construction, installation, erection, extension, structural alteration, improvement, or removal of any permanent structure, temporary structure, improvement or advertising sign on the Premises without the prior written approval of Lessor. If authorized by the Lessor, any such physical changes to the Premises and the improvements thereon shall be at the expense of the Lessee and shall be undertaken in accord with the terms and conditions of this Lease; The Secretary of the Interior's Standards for Rehabilitation, attached hereto and identified as Exhibit D; the Historic Structure Treatment Requirements, attached hereto and identified as Exhibit E; and a Historic Structures Preservation Guide (HSPG) approved by the Lessor which shall constitute Exhibit F.

"Initial Capital Improvements" means the rehabilitation, restoration and/or reconstruction performed by Lessee for initial occupancy of the Premises and compliance with the appropriate codes and accessibility standards as applicable to the Lessee's use and improvements of the Premises.    "Alterations" means any additional improvements, alterations, or rehabilitation, reconstruction, or restoration of or to the Premises by Lessee,

A-6

## 30. COUNTERPART

This Lease may be executed in counterpart.

IN WITNESS WHEREOF, the United States of America, by and through the Secretary of the Interior, has executed and caused this Lease to be executed on its behalf this _25th_ day of _April_ , in the year 2000, as its free act and deed for the uses and purposes herein contained, and intending to be legally bound, has, as of the day and year first above written, caused these presents to be executed by Terry R. Carlstrom, Regional Director, National Capital Region, National Park Service, U.S. Department of the Interior, and does hereby constitute and appoint Terry R. Carlstrom, Regional Director, National Capital Region, National Park Service, U.S. Department of the Interior, as its true and lawful attorney-in-fact to acknowledge this Lease as its free act and deed for these uses and purposes herein contained.

UNITED STATES OF AMERICA, LESSOR

By: _____(Seal)

Terry R. Carlstrom

WITNESS:

_____

Douglas Faris
Superintendent, C&O Canal National Historical Park

This _25th_ day of _April_ , 2000, before me personally appeared Terry R. Carlstrom who did depose and say that he is the Director of the National Capital Region of the National Park Service, and was duly authorized to execute the foregoing instrument and in the name of the United States Department of the Interior, National Park Service, and acknowledged that he had so signed, executed, and delivered said Lease for the consideration, use, and purposes therein mentioned and set forth and acknowledged it to be his free act and deed before me.

Notary Public: _E. Lorraine Link_

My Commission Expires: _9/1/01_

-18-

*A-7*

THIS LEASE is also executed by the Lessee this _25th_ day of _April_, 2000.

By: _____ ,
                                      Mark Kurzawa

_____
                                       Mark Shafer

This _25th_ day of _April_, 2000, before me personally appeared Mark Kurzawa and Mark Shafer, who did depose and say that they are sole Lessees of the Burnside House and Surrounding Grounds, and acknowledged that they had so signed, executed, and delivered said Lease for the consideration, uses, and purposes therein mentioned and set forth and acknowledged it to be their free act and deed before me.

Notary Public: _E. Lorraine Link_
My Commission Expires: _9/1/01_

-19-

Appendix:
B-1 'Burnside Property' AKA 'Joseph Sprigs Property'
AKA 'Dellinger House'

(0) the work completed is subsequently detailed.

* Scope of work & pre-conditions
* Appendix: 'Y' (see www. Herald-Mail.com)
Home Interior: ('Joseph Sprigs Property'
by PAT SCHOOLEY May 2004)

The condition of the home's interior was fair to moderate as it needed paint, floor tile work, repairs to stone wall that had a structurally deficient section that had been encased in drywall. There were also issues with plumbing and fixtures in both bathrooms, as well as plumbing and cabinetry issues in the kitchen. Most doors & windows were structurally deficient.

There were also major electrical issues, septic issues and primary well and plumbing issues in the basement. The furnace systems were inefficient and outdated and required maintence and repairs.

The fireplaces chimney's had significant deterioration and required liners and other repairs before using.

Plaintiff made substantial RENOVATIONS to the interior until around the FALL OF 2003, when work was stopped by 'CEASE & DESIST' order.

B-7

(a) Home Exterior:

The condition of the homes stone exterior was fair at best. While the stone was in good shape overall, the mortar joints were in terrible disrepair and structurally deficient with piecemeal patchwork over the years visible.

The East end of the home was literally sinking and literally seperating from the rest of the home.

The woodwork, dormers, soffit, fascia, sunroom, doors + windows had moderate to serious rot and required complete rebuild in most cases, often deep into the homes structure.

New plumbing, septic and electrical repairs were done to ensure safety and code compliance. The septic was dug up and partially replaced as trees + roots had encroached its integrity.

The end that was sinking was stabilized with new footers + foundation and an intricate system of drainage was designed + installed to prevent the future collection of water in which was undermining the homes integrity.

Plaintiff made substantial improvements

B-3

(12) to The homes exterior Through the fall of 2003, when work was halted due to a 'CEASE & DESIST' work order.

Large BANK BARN:

The BANK BARN was in POOR condition and was in such a state of deterioration That structural collapse was imminent.

The old wood timber structure held together with mortis & tenon joints with wood dow pins was collapsed on the lower level, collapsed in the corn crib on The south end and The entire 110' Rear wall was pushed outward and seperated from The interior timber structures. The Soffit & Fascia was completely rotted and The Roof was severely Rusted and in disrepair. & Foundation crumbling.

This required the consultation of a structural engineer because chances were high That The attempt to repair one area, such as the entire detached wall, would lead to the total collapse of either the first floor structural deficiency on the corn crib area. Alternatively, attempting to repair the lower collapsed areas presented The strong possibility That the entire rear

B-4

(6) Wall in which was already leaning outward (apparently b/ being hit w/ equipment) would easily just fall off the entire back of the barn. There was no simple solution that guaranteed both safety of my crew, nor that the barn would not simply collapse. Believe me when I tell you... Home DEPOT has no 'DO IT YOURSELF' book for such a mess. However, through a determined effort, consultation with the structural engineer, consultation with the neighboring mennonite dude, some tenacious resourcefulness + just plain luck, the repairs were made and the barn was spared. Plaintiff actually purchased a collapsed barn down in WV with similar sized timbers, and literally built temporary support structures each step of the way, using jacks, winches and the likes. The collapsed areas were removed and rebuilt and then the temporary structures removed. That project had a serious WOW factor.

Once the structure was rebuilt, then the repairs on the roof, soffit, fascia + exterior began until we were shut down with a 'CEASE + DESIST' work order in the FALL of 2003.

B-5

(10) Outbuildings:
GARAGE, MILKHOUSE & SPRINGHOUSE

These structures were completed with the exception of possibly the most final details before the 'CEASE & DESIST' work order was issued in the FALL of 2003.

Slavequarters on the South Lawn:

That structure was in a state of imminent collapse and in fact did collapse and required a complete ground-up rebuild. Unfortunately the 'CEASE & DESIST' work order in the FALL of 2003, prevented any work on that structure.

I want to emphasize that Plaintiff, and former partner, Mark Kurzava, did in fact work our fingers to the bone, working day & night, while making selfless sacrifices to ensure that work would be completed. It is simply unfathomable that Kevin Brandt would abuse his position in an oppressive abuse of power in violation of the public's trust to illegally rob me of my every possession.

Appendix: C-1

Financial Damages:

1. House Exterior
2. House Interior
3. Large Bank Barn
4. Garage
5. Springhouse
6. Milkhouse
7. Slave Quarters
8. Other improvements
9. Cash Rent $8100
10. 1ˢᵗ year FREE $10,560

(A) Total Labor, Materials, Equipment & Consulting    $196,650

Illegally Seized:
(B) Vehicles, Materials, Equipment, Furniture & Pers. Property $45,650

Total Losses          $242,300⁰⁰
(Rent used $10,560 x 4.5 years)  (C) − 47,520⁰⁰
(C)  $47,520⁰⁰          $194,780⁰⁰

TOTAL
LOSSES:   $194,780⁰⁰

*Appendix 'Cez'*

**STATEMENT OF WORK FOR CLEAN UP AND HAZARDOUS MATERIAL HANDLING AND DISPOSAL AT NATIONAL PARK SERVICE, C & O CANAL NATIONAL HISTORICAL PARK, BURNSIDE PROPERTY (DELLINGER HOUSE)**

**Burnside Property (Dellinger House)-**
House - 2900 sq. ft. of living space
Outbuildings (including barn) & Grounds

A) $4800
B) $5000
C) $5450
D) $3800
E) $100,000 ($Priceless!) (E) All personal memorabilia & heirlooms

$23,050
$22,600 Original
$45,650 Total
Personal property (less...)

**Scope of Work**

1 - Remove all trash, appliances, housewares (including dishes, personal clothing, lawn mowers, and all other items) in dwelling, outbuildings and grounds WITH EXCEPTION OF WHITE WROUGHT IRON TWIN BED (bed may be removed before cleanup)

(A) The following items have been removed from the property:

(B) *Also: Vehicles*

| | |
|---|---|
| $2000 | Paint from basement and attic |
| $800 | Piano |
| $500 | Full size upright freezer |
| $500 | Queen size bed and mattress |
| $5000 | Wooden dining room table |
| | Numerous boxes $100 |

$4800

($5000) 1 - 1997 Ford Explorer
$2500 = 2 - 1996 Chrysler Concorde
$3000 = 3 - 1994 Ford Windstar
$1500 = 4 - 1989 Lincoln Continental
$2000 = 5 - 1989 Ford Econoline - Work Van

(Estimated - approximately 100 cu. yds. total)

2 - Clean & sanitize (2900 sq. ft. of living space):
- all surfaces of rooms (including basement)
- all bathrooms fixtures
- all kitchen fixtures

3 - Remove & dispose of all hazardous materials in accordance with county and state regulations; i.e., paint, chemicals, etc. Vendor must provide documented experience dealing with hazardous materials.

Please see attached evaluation of property by Richard Durrett, Public Health Consultant, National Park Service, National Capital Region.

(C) *Other personal property seized;*
800 Brand new Stainless Steel Elec. Stove w/ glass cooktop
800 " " " " Side by Side Refrigerator Freezer
800 " " " " Freezer
500 Washer + Dryer
150 Dishwasher
1000 Central Air Unit
1800 3 Windows AC's

$5450

2 ea Desks        $200
2 ea Couch w/ beds  $500
1 small GE Refrigerator  $100
Tools, ladders, pump jacks
power tools, Riding mower   $3000

(D)  $3800



# United States Department of the Interior

NATIONAL PARK SERVICE
C&O Canal National Historical Park
1850 Dual Highway, Suite 100
Hagerstown, Maryland 21740



IN REPLY REFER TO
H3021(CHOH)

March 4, 2004

CERTIFIED - RETURN RECEIPT MAIL

Messrs. Mark Kurzawa and Mark Shafer
15121 Spring Dell Road
Williamsport, Maryland 21795

Re:    Lease No. 3100-00-001 between the United States of America, Lessor, and
       Mark Kurzawa and Mark Shafer, Joint Lessees, dated May 1, 2000.

Dear Messrs. Kurzawa and Shafer:

This letter concerns the above-referenced lease (hereinafter "the Lease"). Given that you are presently in breach of sections 1, 4, 7, 10, and 15 of the Lease, we hereby give notice under section 21 of the Lease of our intention to terminate the Lease and regain possession of the premises, defined as the Burnside House and Surrounding Grounds, as identified in Exhibit A of the Lease, due to your failure to keep and perform the terms, agreements, covenants, conditions, and provisions of the Lease. If these breaches are not satisfactorily remedied within thirty (30) days, then, in accordance with section 21 of the Lease, the Lease shall be void and terminated, and the United States of America shall be entitled to the possession of the premises.

As an initial matter, you have numerous unauthorized animals on the property. This is a violation of section 1 of the Lease, which states, in part, that your use of the premises is subject to the condition that "[p]ersonal pets (dogs and cats) will be allowed but must be contained within the Premises. All other animals and or pets must be approved in writing by the Lessor." If your breach of section 1 of the Lease is not satisfactorily remedied within thirty (30) days, then the United States of America intends to reenter the premises and declare the Lease forfeited.

You have also failed to make monthly rental payments, as specified in section 4 of the Lease and the agreement known as "Proposal for the 'Burnside' Restoration," dated September 5, 2002. More than $4,345 in rent payment is due. Accordingly, you are in breach of section 4 of the Lease, which states, in part, that "[r]ental payments are due to the United States monthly in advance, on or before the first day of the month. All compensation shall be made payable to the NPS, and forwarded by the Lessee directly to the Superintendent, Chesapeake and Ohio Canal National Historical Park." If your breach of section 4 of the Lease is not satisfactorily remedied within thirty (30) days, then the United States of America intends to reenter the premises and declare the Lease forfeited.

Messrs. Kurzawa and Shafer

2

You have also caused or permitted unauthorized ground disturbance, landscaping, and the removal of approximately 109 trees. Accordingly, you are in breach of section 7 of the Lease, which states in part, that:

> Lessee shall obtain Lessor's approval in writing prior to any site improvements, ground disturbing activity, or landscaping treatments; including but not limited to activities such as: the cutting, pruning or removal of any vegetation or trees; the use of pesticides or insecticides; planting plans; paving; utility trenching; and activities changing the contour or condition of the property on either a temporary or permanent basis.

Because of the breach of section 7 of the Lease, you are also in breach of section 15 of the Lease, which provides as follows:

> The Lessee shall at all times exercise due diligence in the protection of the leased Premises against damage or destruction by fire, flood, vandalism, and other causes. Lessee shall exercise additional care to prevent any damage of the historic structure(s) on the Premises. Any portion of the Premises damaged or destroyed shall be promptly repaired, restored, or reconstructed by the Lessee to the satisfaction of the Lessor, or in lieu of such restoration or reconstruction the Lessee shall, if so required by the said Lessor, pay to the United States money in an amount sufficient to compensate for the loss sustained by the United States by reason of damages to or destruction of Government property.

Accordingly, we are requiring you to restore the black locust, red cedar, and box elder trees with specimens of comparable size, or to pay to us $44,644.87 to compensate for the loss sustained by reason of damage or destruction of Government property arising from the unauthorized removal of approximately 109 trees. If your breach of section 15 of the Lease is not satisfactorily remedied in the above-specified manner within thirty (30) days, then the United States of America intends to reenter the premises and declare the Lease forfeited.

You have failed to provide the Lessor with a "Historic Structure Preservation Guide" for each historic structure on the Premises, as required in section 10 of the Lease. Section 10 of the Lease states, in part, "Lessee shall, at its sole cost and expense, prepare for each historic structure on the Premises a 'Historic Structure Preservation Guide' for review and approval of the Lessor." You were to have prepared such "Historic Structure Preservation Guide(s)" within three months of the commencement of the Lease. Accordingly, you are in breach of section 10 of the Lease. If this breach is not satisfactorily remedied within thirty (30) days, then the United States of America intends to reenter the premises and declare the Lease forfeited.

 D-3

Messrs Kurzawa and Shafer

3

You are also in breach of Terms 1, 3, and 5 of the agreement known as "Proposal for the 'Burnside' Restoration," dated September 5, 2002. You have breached Term 1 by not completing all work contained in the original proposal by September 1, 2003. You have breached Term 3 by not paying $715 per month. You also are in breach of Term 5 by failing to maintain the property, both the house and grounds, in a manner consistent with National Park Service expectations.

You may contact my office, (301) 714-2201, should you have any questions regarding this matter.

Sincerely,

Kevin D. Brant
Superintendent

9/5/02  New Contract

*App: E-1*

# MARK P. RYSCAVAGE, ESQ.

15905 Agatha Terrace
Bowie, Maryland 20716
(301) 249-4443 (H)
1-800-303-4930

May 18, 2004

Marie Lurie, Attorney
Office of the Solicitor
U.S. Department of the Interior
Division of Parks and Wildlife
1100 Ohio Drive, S.W.
Washington, D.C. 20242

*✱ Even as early as this notice by our counsel at that time, Mark Ryscavage, the NPS + The Dept of Interior Refused to meet + take the opportunity to provide an administrative remedy... a voluntary waiver by them of the opportunity to do so,*

Re: Lease No: 3100-00-001 – Date: May 1, 200

Dear Ms. Lurie:

I address your letter dated April 28, 2004 and I represent Mark Kurzawa and Mark Shaffer.  Let me respond accordingly:

Paragraph One:

My clients will not vacate the premises because they feel as though they have not been in violation of said Lease.

Paragraph Two:

My clients totally disagree with your allegations.  There was no such loss of trees except at the direction of the Division of Parks and Wildlife, U.S. Department of the Interior.

I suggest that you request an interview with the following people regarding the tree issue and other issues regarding the Lease violations

Doug Faris
Sonny Sanders
Susan Albert

All three witnesses should support my clients' claims.  I will subpoena these witnesses and others if there is litigation.  If any of the alleged "107 trees" cut down were removed, it was to retain the historical character of the property and its environment. Also, my clients were told to remove "atlantis trees" from the property to preserve the landscape.

My clients were instructed to clear out all trees three (3) inches or less in diameter to preserve and prepare the property to allow the replacement of pasture fences

My clients would like to know how you come up with "109" trees which you allege were my clients' responsibility to preserve?

I have reviewed a letter from Terry Carlstrom dated July 16th, 2002 which instructed my clients that they "maintain the entire premises including all structures, lawns, garden areas and park areas in good order and condition".

My clients have complied with all of the above noted conditions and will be supported and documented if we must to Court.

If my clients are evicted, I believe that their civil rights would be violated and they will react accordingly. I request a meeting with the government employees who supervise these matters.

Thank you very much for your time and consideration.

Very truly yours,

MARK P RYSCAVAGE

MPR/at
Cc:  Mark Kurzawa
        Mark Shafer

*Appendix - F*

# Snyder Case Opens Path to Land-Use Appeals

By MIRANDA S. SPIVACK
*Washington Post Staff Writer*

The National Park Service has created a new appeals process for property owners that is allowing Washington Redskins owner Daniel M. Snyder to seek review of a decision preventing repair of a wall within 200 feet of the Chesapeake & Ohio Canal National Historical Park.

The review process, which set up an internal appellate system, could open up the possibility of similar appeals from the other 262 landowners whose properties abut the canal and are subject to Park Service easements, park Superintendent Kevin D. Brandt said at a recent community meeting.

The canal's popular hiking and biking towpath stretches more than 180 miles from Georgetown in the District to Cumberland, Md., and since acquiring the property in 1974, officials have allowed the property to revert to a more natural state. Many of the easements were set up to protect the park by limiting what could occur on adjacent, privately held land, Brandt said.

An inspector general's report last year said the park service had improperly helped Snyder cut down more than 130 trees behind his estate.

Snyder has been seeking the Park Service's permission to rebuild a crumbling retaining wall next to his house, atop a cleared tract of trees near the canal. Like the cleared trees, the wall is within the federally protected scenic easement, which acts as a buffer for the park and does not

allow any structures to be built or rebuilt within 200 feet.

(A) Snyder's spokesman said the wall is in danger of imminent collapse, but last year the Park Service rejected his request to rebuild it because it is within the no-build zone. Snyder then asked how he could appeal, Brandt said. There was no formal system, Brandt said, but the agency decided to set up a process to allow appeals or decisions involving the canal easements.

(B) "Because the park has not actively used this kind of process, we did not know what kind of process to use to establish an appeal," Brandt said at a community meeting held in Potomac to solicit reaction to Snyder's proposal to rebuild the wall.

Brandt said the system allows Snyder to file a formal appeal under the National Environmental Policy Act and allows the agency to evaluate the project's impact on the environment. It also requires a 30-day public-comment period, which began Nov. 1. The cost of the process is paid by the applicant, in this case Snyder.

David P. Donovan, the Redskins' general counsel, told the Park Service last year in a letter that the wall needed immediate repair and its collapse could harm the trees Snyder planted to settle complaints in 2005 about 50,000 square feet of tree cutting done without Montgomery County's permission. The county's forest protection law comes into play when large tracts are cleared.

"It is one of those interesting situations. If you do nothing, something is go-

ing to happen . . . if the hill collapses, it will land in the canal and on the walkway," said Redskins spokesman Karl Swanson, speaking on Snyder's behalf.

In the 2005 agreement with Montgomery, Snyder was to pay \$37,000 for forest conservation elsewhere in the county, to replant trees in the area where they were cut down and to place several acres in a permanent conservation easement.

"It is all substantially completed and will be completed shortly, Swanson said. "A small part of the county section remains to be planted," he said.

Ginny Barnes of the West Montgomery Citizens Association asked Brandt at Wednesday's meeting about the circumstances that led to the wall's condition. She noted that Snyder had built a large ballroom after buying the house for \$10 million from Jordan's Queen Noor in 2001.

"The trees are allowed to be cut on the slope below it. What you have is this constant contribution to the wall collapsing. It has been in trouble for a while. It seems to me everyone has contributed in some fashion — the property owner, the permitting agencies to having this situation occur."

Barnes said that limiting the fix to a section of the wall "and maybe a little beyond it is little more than a Band-Aid," she said.

"Why are we doing this? Is that because the property owner asked for this process? I think the National Park Service needs to look at a larger repair, re-

gardless of where it goes," Barnes said.

Other ways to repair the slope proposed by some of the dozen or so residents who attended the meeting include building a natural berm or moving the wall closer to the house and building up the slope below it by adding soil and plants.

Brandt said the agency will examine all proposals and urged residents to send them to the park service by the end of the month, when the time for public comment expires.

A report by the Interior Department inspector general's office released last year said a high-ranking Park Service official pressured lower-level employees into allowing Snyder to cut down the trees in 2004 and bypass environmental law.

The report said the reappointment should have been left to park biologists and horticulturists, who had advised against the tree-cutting on federally protected land, and should have been opened to public debate.

The report did not accuse Snyder of doing anything improper when he got permission to clear 50,000 square feet of mature trees and replace them with saplings.

In June, Montgomery's planning board turned down a request to clear trees made by Snyder's neighbor, Aris Mardirossian, a prominent developer. He is seeking permission to cut trees on three acres near the canal, where he wants to build a house. Mardirossian said his children are allergic to nut trees on the site.



( *Appendix: G* )



# United States Department of the Interior

### NATIONAL PARK SERVICE
C&O Canal National Historical Park
1850 Dual Highway, Suite 100
Hagerstown, Maryland 21740

IN REPLY REFER TO
H3021 (CHOH)

December 1, 2005

*( Property was seized prior to trial on November 15, 2005 )*

Messrs. Mark Kurzawa and Mark Shafer
15121 Spring Dell Road
Williamsport, MD 21795

Re: Lease No. 3100-00-09001 between the United States of America, Lessor, and Mark Kurzawa
and Mark Shafer, Joint Lessees, dated May 1, 2000

Dear Messrs. Kurzawa and Shafer:

By this letter, the National Park Service is advising you of actions it is taking relative to the personal property you left at the Burnside Property when you vacated the property. By letter dated April 26, 2004, the National Park Service terminated your lease of the Burnside Property and advised you to vacate the property within 45 days. Instead of vacating in a timely fashion, you remained on the property.

On November 25, 2005, the National Park Service learned that you had finally vacated the property. Under section 18 of the lease, you were to have "removed the personal property of the Lessee therefrom, and return the Premises and the property of the United States to as good order and condition as that existing upon the date of commencement of the term of the Lease..." You did not remove your personal property, nor did you leave the property in good order and condition. Section 18 of the lease provides that:

> If the Lessee shall fail or neglect to remove its property and so repair the Premises, then, at the option of the Lessor, said property shall either become the property of the United States without compensation therefore, or the Lessor may cause it to be removed and the Premises to be repaired at the expense of the Lessee, and no claim for damages against the United States or its officers or agents shall be created by or made on account of such removal and repair work.

The National Park Service is having the personal property left at the Burnside Property removed.

Sincerely,

Robert H. Hartman, Jr.
Acting Superintendent

\* On [illegible], I was falsely convicted of
Theft Scheme as the State prevented my witnesses,
my defense documents + my grandmother from
being at my trial.

## Financial Statement:

### Hagerstown Trust (my deposits $5790)

| Start POA: | 10/17/03 | $1220=Mark | |
|---|---|---|---|
| November | 2003 | 2904.70 | 0=Paula |
| December | 2003 | 2930.12 | 0 " |
| January | 2004 | 2930.12 | 0 " |
| February | 2004 | 2930.12 | 0 " |
| March | 2004 | 2930.12 | 0 " |
| April | 2004 | 2930.12 | 0 " |

### Waypoint Bank (my deposits $1955.21)

Widows Pension          SSI + Teachers Pension

| May | 2004 | 429.60 | 2510.52=Paula |
|---|---|---|---|
| June | 2004 | 429.60 | 2510.52 " |
| July | 2004 | 429.60 | 2510.52 " |
| August | 2004 | 429.60 | 2510.52 " |
| September | 2004 | 429.60 | 2510.52 " |
| *total Mark=POA | | $20,923.30 | $12,552.60=Paula's total $ |

Paula withheld $12,552.60
Paula mortgage $11,150.00 + utilities
*Paula did not pay mortgage & utilities to create 'faked'
foreclosure in conjunction with Cindy Diamond
*No Notices - No Hearing & No Default - ONLY A FALSE FORECLOSURE AD
My payouts on grandma's behalf:
*Home improvements $9385.25, Hearing Aid $3015, 4 Chrysler
$2000, taxes 403/04 $3281.87, Groceries, Meds, Entertainment,
& eating out $3840 (80043) grandma's checks $2467.94, Gas
for her care $960 (20043), Other payouts $1533.61
Total Payouts=$26,383.57

Total POA=Me - $20,923.30                                      Appraised
Paid by Me      $5,460.27   Home actually   Pre-work   value   (Post-work $139,000)
Net gain=me     $22,364.75  Sold for $137,730-105,000-9385.25  (for Sines home)
Saved by Me     $13,200.00 vs. Adult Care private daycare
***Benefitted                 By ME only...
*** $42,025.02       Also: 10% Equity in Hybeilco-I.com + $100,000 note
Waypoint Deposit $1955.21 less ($500=stolen?)=$1435.21

---

On October 17th, 2004...
The day after DSS kicked
gma out of their office,
she signed a WILL, +
a Power of Attorney over
to me. I also signed a
$100,000 note (see App      )
+ 10% of my business equity
to her which she assigned
to my siblings.

---

#150: After the ER Doctor spoke to Paula Pierce and her
failure to help gma, we had many sharp verbal arguments and in
September 2003 it came to a head. Paula tried to force me to sign an agreement
that I would resume my gma's care on 9/26/03, when I refused, Paula initiated
a financial exploitation investigation in which I was cleared on 6/7/04, on
May 26, 2004, two weeks earlier, Paula took control of gma's money, so how
could I be found guilty of Theft a year later??? Its a legal impossibility!
Furthermore, my gma was so furious at Paula for the investigation, that she attempted
to call Paula. However, Paula refused to return her calls. Finally, on 10/16/04,
gma made me take her to DSS downtown where Paula & her supervisor
refused to see gma, kicked her out & told her to make an appointment. 9

P. Mark Shafer, RCI# 331-844
Roxbury Correctional Institution
18701 Roxbury Road
Hagerstown, MD 21746
(15121 Spring Dell Rd., Williamsport, MD)
* Burnside Property, AKA Joseph Sprigg Property

*At Appendix: (I)*
*I .1*

December 22, 2006

*☀ This is a brief
Summary of my
fraudulent conviction
that took me away from home,*

U.S. Congressman Roscoe Bartlett
MD Senator Donald Munson
Mayor Bruchey & City Council
Washington County Commissioners

Re.: P. Mark Shafer, RCI# 331-844
Case No.: 21K05-36040
Federal : PJM-06-2222 Civil/*07-183*
MD District: 2682-06 Civil
(Moved to Circuit Court)

To The Powers That Be:

This is your invitation to attend a hearing on January 8, 2007, and witness first hand the corrupt State of Washington County's Circuit Court. Undisputable evidence of fraud designed to obstruct the due course of justice by numerous county officials and employees will be presented.

This case began with the rape of my grandmother's dignity by DSS-APS Paula Price and her supervisor John Kent, Inc, disregarded all except the good doctor's order in February 2003, requiring that they put my grandmother into a home. Last November, Paula perjured herself in open court as she denied ever receiving such order. Amazingly, this perjury had vanished from the transcripts. In Paula's vindictive obsession to retaliate against me for reporting her neglect, she's costing me 15 years of my life. At the hearing, the State humiliated me to death for what was actually Paula's sadistic misdeeds.

This was accomplished by way of HPD Detective Steve Hoover's fraudulent application for statement of charges, which was knowingly signed by a commissioner. Then Deputy SA Joe Michaels, the puppetmaster; conspired with D.P. Creeden; Stephen Sachs,Esq., Cindy Diamond, Esq.; and others to ensure my illegal conviction for a crime that never existed. This, under the direction of SA Charles Strong.

In order to facilitate this constitutionally infirm conviction, Clerk Dennis Weaver, refused to issue my subpoenas for witnesses and records, as did Creeden. When Weaver got caught at this game, he destroyed my motion and then tried to substitute a letter from a later date. (See docket item No. 0011905)

Judge Fred Wright illegally convicted me without even so much as an opportunity for granny to speak her mind, something she despised. They prevented her attendance at trial and now she is dead. Joe Michaels then coerced court reporter, Christine Ellis, to alter and edit my transcripts in

\* *Appendix 'B-2'*

over 30 places; hence, to conceal the State's perjury and fraud while denying me due process on appeal. Do you really think this is what the citizens of Washington County expect from officials here? My grandmother taught for 30 years in Washington County and she deserved to retire with health, honor and dignity. Washington County was legally obligated to ensure that was the case. However, on every level the government failed my grandmother in direct contradiction to State and Federal Laws, as well as the United States and Maryland Constitutions.

These are your employees, the SABOTEURS OF JUSTICE!! An infamous good ole boy/gal network that imposes their homegrown version of efficient injustice in persona; crime or no crime--my crime was being unpopular for reporting Paula's neglect of my grandmother. Paula is an emotionally challenged liability to the county that caused my grandmother great suffering as the agent in charge of her care.

They've caused a fraudulent foreclosure on my grandmother's house, and ran a fraudulent ad in The Herald Mail for no other purpose but to incite VILE emotions against me. There could be no legitimate foreclosure because the State controlled the money, yet, they caused my family to sell the house under duress for $137,750 and then the house was flipped for $271,000.

Washington County Commissioner President Gregory Snook decided that it was a less stressful option to walk away from his responsibility to hold corrupt officials accountable, than take decisive action. They've cost me my family and my business, and after investing OVER $100K on my riverfront farm, the MSP illegally seized everything I owned claiming I abandoned it. It's imperative that you attend in person, otherwise, the saboteurs of justice will just have the record vanish.

Very truly yours,

*[signature]*

D. Mark Thofer
ACI# 331-244

*Additional Timeline of Events:*

**11/1/2006** Appellate P.D. Mark DeSimone withheld my 'Motion for Subpoenas' #0011000, and then forwarded to me a Post Trial letter #RCI dated 12/23/05, for a pretrial docket entry dated 11/4/05.

**1/8/2007** Judge Boone ordered corrected transcripts Rule 1027b to Replace The original fraudulently altered record. Boone refused to appoint counsel, refused to issue subpoenas, refused to order live recording + refused to order the State to turn over specifically Requested BRADY material.

**3/22/2007** Judge McDowell refused to handover the corrected transcripts as the States FRAUD was clear. He scolded "You have a certified copy + that's all you're getting" AND when I requested the live recording, he scolded "You'll never get a copy of that". He refused to appoint counsel.

**7/12/2007** Judge Long started an inquiry into the Office of P.D. refusal to represent me, or as required, to appoint a panel attorney.

**9/27/2007** They still refuse to give me an attorney... they're attempting to bury case.

*Appendix : J-1*

III. STATEMENT OF THE CASE, including
EXHAUSTION OF ADMINISTRATIVE REMEDIES
(some dates are approximate)

| App 'O' | May 18, 2004 | Defendants warned of Civil Rights Violation |
| | November 25th, 2005 | Defendants seized property |
| | December 10th, 2005 | Notice-intent to sue : Kevin Brandt |
| App 'Q' | December 12th, 2005 | Notice of illegal eviction - MD Dist. Court |
| | December 12th, 2005 | Notice of illegal eviction - U.S. Dist Court |
| App L | December 15th, 2005 | 2nd Notice to sue : Kevin Brandt |
| | January 4th, 2006 | U.S. Dist Court responds w/ JS44 complaint |
| App M | January 5th, 2006 | 3rd Notice to sue : Kevin Brandt |
| App P | January 18th, 2006 | MD Dist. Court - Judge France responds |
| App | January 20th, 2006 | MD Dist. Court - "No Eviction" on record |
| App N | January 25th, 2006 | 4th Notice to Kevin Brandt |
| App | June 20th, 2006 | 5th Notice to Kevin Brandt |
| App | July 3, 2006 | Notice of Intent to Sue : Dirk Kempthorne |
| | " " " | Seeking Admin Remedy t/ Dept. Interior |
| App | July 20th, 2006 | Lawsuit filed in MD Dist Court |
| | " " " | *Served on all Defendants |
| | July 25th, 2006 | MD Dist. Court - Costs Waived |
| | August 15th, 2006 | MD Dist. Court - Requested more info |
| | August 18th, 2006 | Requested info sent to MD Dist Court |
| | September 13th, 2006 | MD Dist Court - provided subpoenas |
| App K | September 18th, 2006 | Amended Complaint to MD Dist Court |
| App R | November 20th, 2006 | MD Dist Court - Complaint dismissed |
| | " " " | w/o prejudice - damages exceed jurisdiction |


J-2

STATEMENT OF THE CASE - Continued

Administrative Remedy

~~App~~ June 20th, 2006 -  5th notice to Kevin Beardt

~~App~~ July 3rd, 2006 -  Notice of intent to Sue to
 "    "    "    Secretary Interior - Dirk KempThorne
 "    "    "    * Requested that he resolve this
                dispute prior to Federal Action
August 10th, 2006   Dirk KempThorne not only refused
 "    "    "    to provide Admin Remedy, but
 "    "    "    my request was met with deliberate
 "    "    "    indifference in that he failed to
                respond,

~~App D~~ August 10th, 2006   Dirk KempThorne directed his staff
 "    "    "    to BILL me $148,189.00 for the
                return of my illegally seized prop.
August 16th, 2006   2nd request to Dirk KempThorne
 "    "    "    * Very specific in nature... he again
                refused to even respond

~~App~~ September 20th, 2006   Dept. of Interior denied all requests
 "    "    "    for Admin Remedy and the return
 "    "    "    of my illegally seized property

January 17th, 2007   Dirk W. ???



# United States Department of the Interior

NATIONAL PARK SERVICE
National Capital Region
1100 Ohio Drive, S.W.
Washington, D.C. 20242

*# App : K-1*

*K-1*

IN REPLY REFER TO
A7221 (NCR-RCO)

AUG 1 0 2006

Mr. Phillip Mark Shafer, #331844
Roxbury Correctional Institution (RCI)
18701 Roxbury Road
Hagerstown, Maryland 21746

*(see App C-1) "Demand for Return of all vehicles, personal property and records, That were illegally seized."*

Dear Mr. Shafer:

This is in response to your Freedom of Information Act (FOIA) dated June 20, 2006, and received in our office on July 31, 2006 for records that were "illegally seized, destroyed or displaced from the BURNSIDE PROPERTY, all information, pictures, records, correspondences (sic), notices, articles and all other information relating to the BURNSIDE PROPERTY, the lease for restoration program, any past and present participants names and contact information, all properties owned by the NPS or the Department of the Interior that relates to the C&O Canal, the Potomac river, by frontage, adjacent hereto, or adjoining any plots of land that are associated therewith."

The FOIA, 5 U.S.C. § 552 generally provides that the Government shall make documents available to the public for inspection and copying to the widest extent possible. However, certain classes of documents may be exempt if sound policy grounds exist for invoking an exemption. The FOIA does not require that new records be created in response to a request and only applies to records in existence at the time the request is received.

The FOIA authorizes agencies to assess reasonable standard charges for document search and duplication against individuals seeking access to government records under the FOIA. 5 U.S.C. § 552(a)(4)(A)(i)-(ii). The FOIA also directs agencies to provide documents to FOIA requesters without charge or at a reduced charge if disclosing the information is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii). Since the proper focus of a fee waiver determination is on the benefit to be derived by the public, any personal benefit to be derived by the requester is not a factor in entitling him or her to a fee waiver.

Based on the broad nature of your request, we estimate the processing fees (duplication and search) to be $148,189.00. This figure includes $6,565.00 for records duplication calculated under the "other requesters" category as contained in our regulations at 43 C.F.R. Part 2, Appendix C. The National Park Service has identified an estimated 50,600 pages of responsive records. Further, we estimate that at least 3,372 hours will be spent on search time for these documents. Please note this hourly search figure includes the first two hours of search time which will be provided free of charge to you. 43 C.F.R. 2.17.



The estimate of $6,565.00 was calculated by taking 50,500 pages and multiplying at $.13 per page. This figure includes providing you the first 100 pages of duplicated copies free of charge. 43 C.F.R. 2.17. According to the General Schedule pay scale of employees involved, we calculate that 3,372 hours of search time will be charged at $42.00 per hour.

Before we can proceed further with the processing of your FOIA request, we require advanced payment of the $148,189.00 that we estimate it will cost to process your request. 43 C.F.R. 2.18(c)(1). In order to reduce the associated processing costs and lessen the amount of time spent on this FOIA, you may decide to reduce its scope.

Your letter of June 20, 2006 did not request a fee waiver, nor did it state your willingness to pay all fees associated with processing your request, or, in the alternative, that you are willing to pay up to a certain amount. Hence, in accordance with 43 C.F.R. § 2.8(b), we will not begin processing your FOIA request until advanced payment has been received.

Pursuant to 43 C.F.R. 2.8 (b)(1), the NPS will not start processing your request until this written assurance has been received. If we do not receive written assurance of payment, or direction from you that reduces the scope of this request within 20 workdays of the date of this letter, we will assume you are no longer interested in this matter and we will close the file on your request.

We appreciate your interest in the NPS. If you have any questions about this letter, please contact Mr. William Line, FOIA Officer, National Park Service, National Capital Region, 1100 Ohio Drive, S.W., Room 106, Washington, D.C. 20242.

Sincerely,

Acting Deputy Regional Director, National Capital Region



# United States Department of the Interior

NATIONAL PARK SERVICE

National Capital Region

1100 Ohio Drive, S.W.

Washington, D.C. 20242

IN REPLY REFER TO

SEP 2 0 2006

A7221 (NCR-RCO)

Mr. Phillip Mark Shafer, #331844
Roxbury Correctional Institution (RCI)
18701 Roxbury Road
Hagerstown, Maryland 21746

Dear Mr. Shafer:

This is in response to your handwritten Freedom of Information Act (FOIA) letter dated
August 16, 2006 and received in our offices on September 6, 2006. This letter also
follows on our August 10, 2006 letter to you in response to your first FOIA request dated
June 20, 2006 and received in our office on July 31, 2006.

Your August 16, 2006 letter requests that the National Park Service waive the costs
associated with the processing of your request as well as stating that you will narrow the
scope of your FOIA request. However, we find your letter to be devoid of any
explanation to direct the National Park Service on precisely how you would reduce the
scope of your FOIA request. Simply stating that you will narrow the scope of your
request does not provide the National Park Service sufficient guidance on how to proceed
with any reduction in scope.

Regarding your request for a waiver of costs associated with the processing of your
request, the FOIA directs agencies to provide documents to FOIA requesters without
charge or at a reduced charge if disclosure of the information is in the public interest
because it is likely to contribute significantly to the public understanding of the
operations or activities of the government and is not primarily in the commercial interest
of the requester. 5 U.S.C. § 552(a)(4)(A)(iii). As stated in our FOIA regulations, "[t]he
burden is on you to justify entitlement to a fee waiver. .... The bureau will rely on the
fee waiver justification you have submitted in your letter. If you do not submit sufficient
justification, your fee waiver will be denied." 43 C.F.R. § 2.19(a). (A detailed
explanation of the Department of the Interior's fee waiver criteria is set forth in Appendix
D to 43 C.F.R. Part 2, a copy of which is enclosed.)

While the records you seek concern the operations or activities of the government, the
disclosure of which would not to our discernment be primarily in your commercial
interest, your fee waiver request does not address how disclosure of the records will
likely contribute to public understanding of government operations and activities, nor
does it address whether such release will contribute significantly to public understanding.



*Official Copy* *App: K-4*

*K-4*

Instead, your letter of August 16, 2006, simply states "I'm going to ...ask that you waive the costs." This statement is an insufficient basis on which to award a fee waiver. Accordingly, your request for a fee waiver is denied.

Under FOIA, you have the right to appeal this determination within 30 days of the date of this letter (Saturday, Sunday and public holidays excepted) in accordance with 43 CFR § 2.30. A copy of the appeal regulations is also enclosed with this letter. Address your appeal to the FOIA Appeals Officer, Office of Information Resource Management, U.S. Department of the Interior, 1849 C Street, NW., MS-7456-MIB, Washington, D.C. 20240. Both the envelope and the letter should be clearly marked, "Freedom of Information Act Appeal."

Pursuant to 43 CFR 2.21(d)(5), Maria Lurie, Attorney-Advisor, Division of Parks and Wildlife, Office of the Solicitor, U.S. Department of the Interior, was consulted regarding this response.

Should you have any questions regarding this matter, please contact Mr. Bill Line, the National Capital Region's FOIA Officer at (202) 619-7222 or at the above address.

Sincerely,

Lisa A Mendelson - Ielmini

Deputy Regional Director, National Capital Region

Enclosures

(DENIED – JUDGE FRANCE)

Denied
Fett
1-3-06

＊APP° 'O'

* Initial Request
A) by me for a
   Stay of eviction
   + court date

* Mailed
B) by me
   on 12/9/05
   from D.O.C.

* Received +
   Stamped by
C) Clerk of
   MD Dist Court
   12/19/05

* Denied.
   1/3/05
D) by
   Judge
   France

To: Clerk of District Court
From: P. Mark Shafer. #331844
      18701 Roxbury Rd Hag MD 21746
      I have a very difficult situation
as I'm incarcerated a RCI-Hagerstown
I'm having great difficulties w/ my
landlord. I have rent paid in
advance for the next 5 years &
he's trying to take my property,
He's already stolen my cars and
other personal property.
   1) Please file for a court date
      regarding this matter
   2) I ask that Judge France
      issue a temporary stay
      on any actions against the
      landlord.
   3) I ask that necessary writs for
      Transportation to court from RCI
      be provided.
   4) I ask that you forward any formal
      paperwork &/or related info that
      I can learn my rights, be
      forwarded to me. Thank You!
         Graciously Submitted, Mark
                                    Shafer

cc: Judge's
ruling
mailed
to Shafer

✱ App° 'P-1'

✱ Second Request for intervention by

A) MD Dist. Court Mailed 12/12/05

✱ Received by

B) MD Dist. Court 1/13/06

C) ✱ Judge France Requests clerk to locate file on The eviction. dated 1/18/06

⊛ Try to find a file on this one 1-18-06

To: Honorable Judge Ralph F.
France, Mark Shate #331844

Dear Judge France,

I have a dilemma as I'm incarcerated at RCI + my landlord is trying to take my property. My rent is paid until 2009 + he has already stolen my cars + who knows what else. I ask That you please set a court date + order a "stay" on any further action by my landlord. (Note: my landlord will be moved into this property and on being complete...

I have 10's of Thousands in equity into this property and am being completely taken advantage of.

Please also unable any... That they be needed to insure my appearance. Any assistance That you may offer me will be graciously appreciated.

Mark Shate
#331844
18701 Roxbury Rd

**FILED**
JAN ...
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

08 0183

*APP: 'P-2'

Judge Traune,

Here's The specific info as to The best of my memory.

Property Address: Williamsport, MD 21795
15181 Spring Dell Rd.

Landlord - Kevin Brandt
Employed: Geo Care/NETcare/Mark Service
located:
O'Conor Piper + Flynn Building
Doey Highway
Hagerstown, MD

* Rent is paid in Full Through [...]
- Undisputable

* I ask for a 'Stay' on eviction process
+ an 'Order' barring Their entry to
property + along w/ Removal of padlocks
+ The Return of all vehicles + personal
property clearly reserved.

* Also: Transportation needs to insure my appearance
* This, pending The outcome of pending Civil Action

RECEIVED
06 JAN 13 PM 1:38
US DIST COURT
HAGERSTOWN



*# Apps 'Q'*

District Court of Maryland

36 W. Antietam Street
Hagerstown, MD 21740
240-420-4600

January 20, 2006

Mark Shafer, #331844                    *# No Eviction Proceedings —*
Roxbury Correctional Institution
18701 Roxbury Road
Hagerstown, MD 21746

Dear Mr. Shafer:

   The District Court cannot locate any cases involving a landlord/tenant case under your name.  Before a landlord can have you evicted from rental property, he or she would have to file an action with the Court.  A trial date would be assigned and you would be notified to appear in Court.

   If you have been served with a summons to appear in Court, please notify the District Court in writing of your case number and trial date.  We will then issue a Writ of Habeas Corpus for you to appear for trial.

                          Very truly yours,

                          Dawn J. Georg
                          Dawn J. Georg
                          Civil Supervisor

PHILLIP MARK SHAFER #331844 RCI         *   CIVIL NO. 2682-06
                                        *
vs.                                     *   IN THE DISTRICT COURT FOR
                                        *
KEVIN BRANDT, SUPERINTENDENT,           *   WASHINGTON COUNTY
   C&O CANAL NPS                         *
JAMES PERRY, ADMINISTRATOR,             *
   C&O CANAL NPS                         *
DICK KEMPTHORNE, SECRETARY,             *
   DEPT. OF THE INTERIOR                 *
WILL REYNOLDS, AGENT, U.S. PARK POLICE  *

*********************************************************************

## COURT ORDER

The Plaintiff, Phillip Mark Shafer, has filed suit in the above case against Kevin Brandt,

James Perry, Dick Kempthorne and Will Reynolds. He is requesting a return of real estate

and damages in excess of $521,880.00. The amount of claim exceeds the jurisdictional limit

for District Court, and District Court has no jurisdiction over ownership to real estate.

Accordingly, this suit is dismissed without prejudice, and the Plaintiff may refile in the

Circuit Court.

Ralph H. France, II
Judge

November 20, 2006

cc: Phillip Mark Shafer
    Kevin Brandt
    James Perry
    Dick Kempthorne
    Will Reynolds

(15)

*Affidavit:*

The enclosed complaint and supporting documents are true and correct to the best of my knowledge and belief and I attest thereto under the possible penalty of perjury.

1/12/08

*Certificate of Service:*

I certify that a copy of the foregoing lawsuit has been served and delivered to the Defendants and the U.S. Attorney's Office by way of CERTIFIED MAIL on or around January 10, 2008.

1/10/08